# EXHIBIT A



Kathleen E. Johnston  VIA MAIL AND EMAIL (CIVINS@CIVINSDENKO.COM)
(415) 693-2107
kjohnston@cooley.com


July 1, 2010

Conor Civins, Esq.
Civins Denko Coburn & Lauff LLP
816 Congress Avenue, Ste. 1205
Austin, TX  78701

**RE: Facebook, Inc. and Lamebook, LLC (LAMEBOOK)**

Dear Mr. Civins:

I write further to your conversations with Christen Dubois regarding Facebook's objections to your client's use of the trademark LAMEBOOK at lamebook.com and on its Lamebook Facebook Page, and the proposed agreement for phasing to a different name.  While Facebook in general does not take issue with the posting of information about Facebook, or to fair use references to Facebook, we firmly object to attempts to create brand names that trade off of Facebook's fame.

As you know, Facebook is a recognized worldwide leader in providing services relating to online communities and other services on its facebook.com website.  Facebook owns exclusive rights to the FACEBOOK mark, including rights secured through common law use, and registration in the United States (U.S. Trademark Registrations 3,041,791, 3,122,052, 3,734,637, 3,659,516, 3,716,926 and 3,734,637) and internationally.

Facebook's website at http://facebook.com has been recognized as among the top two most-trafficked websites of any kind in the U.S. and the world by Alexa.com.  As of February 2010, Facebook provides online networking services in over 70 languages to over 400 million monthly active users worldwide, more than 200 million of whom typically log on to the Facebook website on any given day.

As a result of the considerable publicity afforded the FACEBOOK mark and the enormous and loyal base of customers that Facebook has for its services, the FACEBOOK mark has extensive consumer recognition and is, indisputably, famous and entitled to all the protections afforded famous trademarks.

Facebook has been the subject of thousands of unsolicited stories and references in television, radio, and print media, highlighting Facebook's innovation and success in providing online networking services.  Time Magazine recently recognized that Facebook is one of the web's most prominent companies.  (*See* http://www.time.com/time/business/article/0,8599,1990582-1,00.html.)  Facebook has been recognized and awarded for its endeavors, including Insider Most Likely to Change the World in 2009, Crunchie Best Overall Product Award in 2009, Harvard Business School's "Entrepreneurial Company of the Year" in June 2008,



Conor Civins, Esq.
July 1, 2010
Page Two

BusinessWeek's "The World's 50 Most Innovative Companies" in 2008 and The Crunchie Award for Best Overall Startup in 2007 and 2008.

In addition, nearly every major entertainment, news and media site you can think of uses Facebook to make the web a more social place. Nine out of the top 10 news sites, 10 out of the top 10 iPhone apps, and 20 TechCrunch 50 finalists implement Facebook Connect.

Lamebook's use of the LAMEBOOK mark infringes Facebook's well-established trademark rights in the FACEBOOK mark in violation of Section 43(a) of the Lanham Act by causing a likelihood of consumer confusion and a likelihood of mistake as to the affiliation, connection, or association of its websites with the famous Facebook website, and by falsely creating the impression of sponsorship or approval of those websites by Facebook. In analyzing whether confusion is likely, a trier of fact will look at standard factors, such as those outlined in *In re E.I. Du Pont de Nemours & Co.*, 476 F.2d 1357, 177 U.S.P.Q. 563 (C.C.P.A. 1973). These factors include such items as: (1) the strength of the mark; (2) proximity of the services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing and/or trade channels used; (6) type of services and the degree of care likely to be exercised by the purchaser; and (7) defendant's intent in selecting the mark. Consideration of these factors reveals that a trier of fact could only conclude that confusion between the LAMEBOOK mark and the FACEBOOK mark is likely.

First, the FACEBOOK mark is extremely strong. As shown above, Facebook will easily establish that its mark is famous under Section 43(c) of the Lanham Act. "The more 'famous' and 'well-known' a plaintiff's mark, the greater the likelihood that use on [even] noncompetitive products will cause confusion." 3 McCarthy § 24.49. The Federal Circuit "has consistently afforded strong marks a wider latitude of legal protection than weak marks." *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 22 U.S.P.Q.2d 1453 (Fed. Cir. 1992). This factor favors Facebook.

Second, there is a direct overlap in the services provided under the FACEBOOK mark and those claimed and provided in connection with the LAMEBOOK mark. Your client's LAMEBOOK applications claim services identical to those offered by Facebook, including: "blogs featuring commentary regarding social networking" and "providing a website featuring information and commentary regarding social networking content and pop culture." Its website at www.lamebook.com purports to be "the funniest and lamest of facebook," contains content taken directly from the Facebook site, and invites users to post their status and comment on the posts of others. Not only is it providing core aspects of the services Facebook provides under the FACEBOOK mark, it is also providing actual content from Facebook. There is no question that the relatedness of service factor supports a finding of likelihood of confusion.

Even if the services provided under the LAMEBOOK mark did not directly compete with Facebook's services, the services would be sufficiently related: "The vast majority of modern decisions have adopted the rule that competition is not necessary between the parties for there to be a likelihood of confusion." 3 McCarthy § 24.13.

Third, the marks at issue are very similar. Both are eight letter, two syllable marks sharing the same second and fourth letter and ending in the term BOOK. Moreover, the genesis of your



Conor Civins, Esq.
July 1, 2010
Page Three

client's mark is obvious from the tagline: "the funniest and lamest of facebook." Taking the distinctive BOOK suffix of the Facebook mark, your client's mark is clearly meant to indicate that it supplies "**Lame** Face**book** posts." This similarity is only aggravated by the overall context of your client's website, including its actual use of the FACEBOOK mark in its tagline, the publication of content from the Facebook site, pervasive use of Facebook trade dress and symbols, and the numerous nonsubtle references to Facebook such as the language "*What's REALLY on your mind*?" in the status update field.

A review of the remainder of the *Dupont* factors lends further support to the conclusion that confusion is likely. Evidence of actual confusion is rare, and its absence is easily outweighed when the remaining factors indicate a likelihood of confusion. The services use an identical trade channel, namely, the internet, exclusively. Your client's site even relies on and promotes itself via the Facebook service; there would be no Lamebook without Facebook. The users of Lamebook's website are Facebook users or those interested in reading about Facebook. And, given the nature of the sites and the internet, it will be presumed that such users exercise no special care in their selection and use of these sites. Finally, there is no doubt your client was aware of Facebook and on notice of Facebook's trademark registrations at the time it selected its mark.

Your client's use of the LAMEBOOK mark also creates a likelihood of dilution in violation of Section 43(c) of the Lanham Act, threatening to damage Facebook's strong and exclusive rights in its famous FACEBOOK mark. In evaluating claims for dilution, courts look to six, non-exclusive factors: (1) degree of similarity of the marks; (2) distinctiveness of the famous mark; (3) exclusivity of use of the famous mark; (4) degree of recognition of the famous mark; (5) whether the defendant intended to create an association with the famous mark; and (6) any actual association between the marks. 15 U.S.C. § 1125(c)(2)(B). Using these factors, the Ninth Circuit held that a reasonable trier of fact could find the HOT WHEELS mark was diluted by the mark HOT RIGZ used in connection with toy vehicles. *Jada Toys Inc. v. Mattel Inc.*, 85 U.S.P.Q.2d 1895, 1899-1901 (9th Cir. 2008). Similarly, the Ninth Circuit held that the marks PERFUMEBAY and PERFUME BAY used in connection with online sales of perfume were likely to dilute the EBAY mark. *Perfumebay.com Inc. v. eBay Inc.*, 84 U.S.P.Q.2d 1865, 1876-77 (9th Cir. 2007) ("consumers may no longer associate the usage of the "Bay" suffix with eBay's unique services, specifically the sale of products on an internet-based marketplace").

As discussed above, the marks at issue here are very similar and the FACEBOOK mark is famous and highly distinctive in connection with online communities and social networking. Moreover, Facebook is the exclusive user of the FACEBOOK mark. Just as the EBAY mark was likely to be diluted by the use of a generic term ("perfume") plus the distinctive term BAY in connection with an online marketplace, your client's use of the mark LAMEBOOK, including the distinctive BOOK suffix, to clearly indicate that it offers "**Lame** Face**book** posts" in connection with an online community is likely to dilute the famous FACEBOOK mark.

I understand that you have advised your client that its use of the mark LAMEBOOK is protected by the parody defense. It is easy to see how you might be tempted to make this argument.



Conor Civins, Esq.
July 1, 2010
Page Four

Nonetheless, this defense is not available to your client since the Lamebook site is not a successful parody under the relevant authority.

The critical element of the parody defense is that the junior work comments on or otherwise criticizes the original work.  For example, in *Dr. Seuss Enterprises LP v. Penguin Books USA Inc.*, 42 USPQ2d 1184 (9th Cir. 1997), the defendant's mimicry of Dr. Seuss's style in creating his own book about the OJ Simpson case (titled *The Cat NOT in the Hat!*) was held **not** to be a parody, mainly because it did not provide any commentary on Seuss or his work.  Quoting the Supreme Court, the Ninth Circuit observed:

> [T]he heart of any parodist's claim to quote from existing material is the use of some elements of a prior author's composition to create a new one that, **at least in part, comments on that author's works**. . . . If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, **which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh**, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger.

(Emphasis added.)  In rejecting the defendant's arguments, the court observed that "[a]lthough *The Cat NOT in the Hat!* does broadly mimic Dr. Seuss' characteristic style, it does not hold *his style* up to ridicule.  The stanzas have 'no critical bearing on the substance or style of' *The Cat in the Hat*.  [Defendants] merely use [Seuss's work] 'to get attention' or maybe even 'to avoid the drudgery in working up something fresh.'"

As in *Penguin Books*, the Lamebook website does not actually provide any critique or comment of Facebook itself.  Rather, Lamebook's satiric finger is pointed squarely at the individual people who make funny or "lame" comments.  Lamebook is one among many trying to entertain the masses by collecting the flubs, follies and foibles of others, whether occurring on the sidewalk, on TV, or via other communications media.  This is no comment on Facebook.  And the commercial nature of the Lamebook site and the prevalence of advertising further detract from any claim of parody.  *Columbia Pictures Industries Inc. v. Miramax Films Corp.*, 48 USPQ2d 1801 (C.D. Cal. 1998).

In the end, both Facebook and your client will be better off if your client comes up with a creative and distinctive name and website that does not incorporate or imitate Facebook's intellectual property.  As I'm sure you have discussed with Facebook's in house counsel, Facebook encourages competition and tolerates fair use of its name.  However, we simply ask that your client's *brand* be of its own original creation.

To reiterate, although Facebook does not object to the posting of information or opinions about Facebook, we must object to attempts to create brand names that imitate Facebook's valuable trademarks.

Facebook is prepared to enforce its rights to the full extent of the law, including but not limited to terminating Lamebook's presence on the Facebook site and opposing its trademark



Conor Civins, Esq.
July 1, 2010
Page Five

applications. However, I understand that you and Christen Dubois remain in discussions regarding a possible amicable resolution. In the spirit of resolution and as a showing of good faith, Facebook has postponed taking action for the time being.

To resolve this matter, Lamebook must at minimum come up with its own original name and site design that do not appropriate Facebook's valuable intellectual property. To be specific, we require that Lamebook (1) abandon <u>all</u> applications to register marks containing the term LAMEBOOK; (2) permanently cease use of the LAMEBOOK mark or any mark with the BOOK suffix and agree not to seek to register such marks; (3) permanently cease use of Facebook trade dress; (4) permanently cease use of the FACEBOOK mark in connection with any logos or taglines; (5) agree to only use the name Facebook within the limits of fair use; and (6) agree to take no further action that infringes Facebook's intellectual property rights.

This letter is without prejudice to any rights and remedies of Facebook, all of which are expressly reserved.

Very truly yours,

Cooley LLP

Kathleen E. Johnston

KEJ:ll

1179688 v1/SF